# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

CHEROKEE NATION BUSINESSES, LLC; CHEROKEE NATION ENTERTAINMENT, LLC; JENNIFER MCGILL,

*Plaintiffs-Appellants*,

v.

STATE OF ARKANSAS; ARKANSAS RACING COMMISSION; ALEX LIEBLONG, in his official capacity; MARK LAMBERTH, in his official capacity; STEVE ANTHONY, in his official capacity; DANNY EAST, in his official capacity; MICHAEL POST, in his official capacity; JOHN SCHMELZLE, Arkansas Racing Commissioner; STEVE LANDERS, in his official capacity,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Eastern District of Arkansas,
No. 4:24-cv-00969

## BRIEF FOR APPELLANTS

BART W. CALHOUN
SCOTT P. RICHARDSON
LAUREN MCCAULEY
BRITTANY DAWN WEBB
MCDANIEL & WOLFF
1307 W. Fourth Street
Little Rock, AR 72201
(501) 954-8000

PAUL D. CLEMENT
MATTHEW D. ROWEN
JAMES Y. XI
NICCOLO A. BELTRAMO
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellants*

January 20, 2026

## SUMMARY OF THE CASE AND
## REQUEST FOR ORAL ARGUMENT

Plaintiffs-Appellants Cherokee Nation Businesses, LLC, Cherokee Nation Entertainment, LLC, and Jennfier McGill operate casinos to help finance critical healthcare and education initiatives within the Cherokee Nation.  Appellants' casino revenues make up 40% of the profits they remit to the Nation each year.  In 2018, Arkansas legalized casino gaming and authorized the issuance of four casino licenses, one of which it awarded to Appellants after they courted local support and made plans to spend over $225 million to build the casino, along with another $38 million to develop the local economy.  But before the casino could be built, and after some of those substantial investments had been irrevocably made, Arkansas did an about-face.  Beset by a sophisticated lobbying campaign orchestrated by Appellants' Oklahoma-based business rivals, the Choctaw Nation of Oklahoma, Arkansas amended its state constitution to revoke Appellants'—and only Appellants'—casino license.  Worse still, it did so without compensation to Appellants and for the sole purpose of protecting Choctaw Nation's pocketbook, violating the United States Constitution multiple times over in the process.  The district court erroneously dismissed Appellants' claims, concluding that several procedural defects doomed them.  This Court should correct that error and reverse.

Appellants respectfully request that the Court schedule this appeal for oral argument, and suggest that it allot each side 20 minutes to present its case.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eighth Circuit Rule 26.1A, the undersigned hereby certifies that Plaintiffs-Appellants Cherokee Nation Businesses, LLC, and Cherokee Nation Entertainment, LLC, are limited liability companies organized under the laws of the Cherokee Nation. Cherokee Nation Businesses has no parent company and is the sole parent company of Cherokee Nation Entertainment. No public corporation owns 10% or more of stock in either company.

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ................................................................................. i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES ................................................................ v

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF THE ISSUES ......................................................... 1

INTRODUCTION ............................................................................... 2

STATEMENT OF THE CASE ............................................................ 5

I.      Factual Background ................................................................. 5

        A.      CNB Successfully Bids for an Arkansas Casino License to
                Support the Cherokee Nation's Education and Healthcare
                Initiatives. ..................................................................... 5

        B.      Arkansas Unexpectedly Revokes CNB's Casino License to
                Support CNB's Oklahoma-Based Business Competitor .................... 10

II.     Proceedings Below. ................................................................ 14

STANDARD OF REVIEW ................................................................ 19

SUMMARY OF ARGUMENT .......................................................... 20

ARGUMENT ..................................................................................... 22

I.      Amendment 104 Violates The Takings Clause By Depriving CNB
        Of Its Vested Property Rights Without Compensation. .............................. 22

        A.      Extinguishing CNB's Casino License Without Compensation
                Violated the Takings Clause Twice Over. ......................... 23

                1.      Arkansas abolished CNB's valuable property interest,
                        but paid no—let alone "just"—compensation for what
                        it took. ....................................................... 23

2.     Even if Arkansas paid up, its taking would still be unconstitutional, given its purely private motivation. ............. 28

B.     The District Court's Invented State Administrative Exhaustion Requirement Contravenes Binding Supreme Court Precedent. .................................................................. 34

II.    Amendment 104 Violates Equal Protection By Subjecting CNB To Special, Disfavored Treatment Because Of Animus And Economic Protectionism. ............................................................................ 39

CONCLUSION ...................................................................................... 48

CERTIFICATE OF COMPLIANCE ......................................................... i

CERTIFICATE OF SERVICE ................................................................ ii

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Equip. Mfrs. v. Burgum*,
  932 F.3d 727 (8th Cir. 2019) ..............................................................30

*Atkinson v. Bohn*,
  91 F.3d 1127 (8th Cir. 1996) ..............................................................19

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021)...........................................................................24

*City of Cincinnati v. Vester*,
  281 U.S. 439 (1930)...........................................................................30

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)..................................................................... 1, 47

*Conyers v. City of Chicago*,
  10 F.4th 704 (7th Cir. 2021) ..............................................................35

*Craigmiles v. Giles*,
  312 F.3d 220 (6th Cir. 2002) ....................................................... 1, 45

*Dahlen v. Shelter House*,
  598 F.3d 1007 (8th Cir. 2010) ................................................... 31, 32

*Dalton v. Reynolds*,
  2 F.4th 1300 (10th Cir. 2021) .................................................... 41, 42

*Dandridge v. Williams*,
  397 U.S. 471 (1970)...........................................................................48

*Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973)...........................................................................46

*Devillier v. Texas*,
  601 U.S. 285 (2024)..................................................................... 35, 36

*Dixon v. Lowery*,
  302 F.3d 857 (8th Cir. 2002) ..............................................................25

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)..............................................................23

*Edelman v. Jordan*,
415 U.S. 651 (1974)..............................................................39

*Engquist v. Or. Dep't of Agric.*,
553 U.S. 591 (2008)..............................................................40

*Ercegovich v. Goodyear Tire & Rubber Co.*,
154 F.3d 344 (6th Cir. 1998) ..............................................42

*Ex parte Young*,
209 U.S. 123 (1908)..............................................................39

*Fulton v. Fulton Cnty. Bd. of Comm'rs*,
148 F.4th 1224 (11th Cir. 2025) ..........................................38

*Haw. Housing Auth. v. Midkiff*,
467 U.S. 229 (1984).......................................................... 31, 32

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
486 F.3d 430 (8th Cir. 2007) ..............................................27

*Hayes v. Missouri*,
120 U.S. 68 (1887)................................................................40

*Heller v. Doe ex rel. Doe*,
509 U.S. 312 (1993)..............................................................48

*Hodel v. Irving*,
481 U.S. 704 (1987)........................................................... 1, 24

*In re Estate of Drake*,
4 A.3d 450 (D.C. 2010) ........................................................44

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
41 F.4th 29 (1st Cir. 2022)....................................................35

*Kelo v. City of New London*,
545 U.S. 469 (2005)............................................... *passim*

*Knellinger v. Young*,
134 F.4th 1034 (10th Cir. 2025) ........................................................35

*Knick v. Township of Scott*,
588 U.S. 180 (2019) ............................................................ 1, 34, 36

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ................................................................27

*Lynch v. ITT Educ. Servs., Inc.*,
571 F.App'x 440 (6th Cir. 2014) ........................................................42

*Merrifield v. Lockyer*,
547 F.3d 978 (9th Cir. 2008) ........................................................45

*Missouri Pac. Ry. Co. v. Nebraska*,
164 U.S. 403 (1896) ................................................................30

*Nekrilov v. Jersey City*,
45 F.4th 662 (3d Cir. 2022) ........................................................24

*Nordlinger v. Hahn*,
505 U.S. 1 (1992) ................................................................47

*Pakdel v. City & Cnty. of San Francisco*,
594 U.S. 474 (2021)........................................................ 1, 34, 35, 36

*Pharm. Rsch. & Mfrs. of Am. v. Williams*,
64 F.4th 932 (8th Cir. 2023) ........................................................ 36, 37

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
490 U.S. 477 (1989)................................................................36

*Roemmich v. Eagle Eye Dev., LLC*,
526 F.3d 343 (8th Cir. 2008) ........................................................19

*Romer v. Evans*,
517 U.S. 620 (1996)........................................................ 1, 46, 48

*Santa Clara Pueblo v. Martinez*,
436 U.S. 49 (1978)................................................................5

*Sarlo v. Pulaski Cnty.*,
　88 S.W. 953 (Ark. 1905)............................................................. 25, 26

*St. Joseph Abbey v. Castille*,
　712 F.3d 215 (5th Cir. 2013) ...............................................................45

*Tri-B Advert., Inc. v. Ark. State Highway Comm'n*,
　539 S.W.2d 430 (Ark. 1976) ...............................................................37

*Tyler v. Hennepin Cnty.*,
　598 U.S. 631 (2023)...............................................................................27

*Urban Hotel Dev. Co. v. President Dev. Grp., L.C.*,
　535 F.3d 874 (8th Cir. 2008) ...............................................................19

*Village of Willowbrook v. Olech*,
　528 U.S. 562 (2000)............................................................................ 1, 40

**Constitutional Provisions**

U.S. Const. art. III, §2, cl. 1 ....................................................................1

U.S. Const. amend. V............................................................... 2, 21, 23

U.S. Const. amend. XIV, §1....................................................................40

Ark. Const. art. V, §20.......................................................................... 37

Ark. Const. amend. 100, §3....................................................................47

Ark. Const. amend. 100, §3(a)..................................................................7

Ark. Const. amend. 100, §4(a)..................................................................7

Ark. Const. amend. 100, §4(e)(8) ...................................................... 7, 27

Ark. Const. amend. 100, §4(f)..................................................................7

Ark. Const. amend. 100, §4(j)....................................................... 7, 41, 43

Ark. Const. amend. 100, §4(k)....................................................... 7, 26

Ark. Const. amend. 100, §4(*l*)....................................................... 8, 26

Ark. Const. amend. 100, §4(m)-(n).........................................................8

Ark. Const. amend. 100, §4(n) ............................................................. 41, 43

Ark. Const. amend. 100, §4(o) ................................................................. 7

Ark. Const. amend. 100, §4(q) ................................................................. 8

Ark. Const. amend. 104, Popular Title ..................................................... 41

Ark. Const. amend. 104, §§1-2 ............................................................... 11

Ark. Const. amend. 104, §2 .............................................................. 24, 39

Ark. Const. amend. 104, §3 ..................................................................... 11

## Statutes

28 U.S.C. §1331 ...................................................................................... 1

42 U.S.C. §1983 .................................................................................... 39

Ark. Code §3-2-212 ............................................................................... 26

Ark. Code §25-15-211(c) ................................................................. 26, 27

Ark. Code §25-44-215(a) ................................................................. 18, 37

Ark. Code §25-44-215(b) ....................................................................... 38

## Rules

23 Ark. Code R. §358-217(b) ................................................................. 26

23 Ark. Code R. pt. 358, subpt. 4 .......................................................... 26

23 Ark. Code R. §358-406(a) ................................................................. 25

Ark. Casino Gaming R. 4.040 ................................................................. 25

## Other Authorities

Ark. Sec'y of State, Notice for Constitutional Amendment Proposed
By Petition of the People, https://perma.cc/2V6Q-VVHX ................................. 7

William Michael Treanor, *The Original Understanding of the Takings
Clause and the Political Process*, 95 Colum. L. Rev. 782 (1995) ..................... 24

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this suit under 28 U.S.C. §1331 and U.S. Const. art. III, §2, cl.1 (federal-question jurisdiction). The district court entered final judgment on August 28, 2025, J.App.1166, R.Doc.140, and Appellants filed a timely notice of appeal on September 25, 2025, J.App.1167-68, R.Doc.141. This Court therefore has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether Amendment 104 to the Arkansas Constitution, which extinguished Appellants' vested license to operate a casino in Pope County, Arkansas, constituted an unconstitutional uncompensated taking under the Fifth and Fourteenth Amendments.

- *Kelo v. City of New London*, 545 U.S. 469 (2005)
- *Knick v. Township of Scott*, 588 U.S. 180 (2019)
- *Pakdel v. City & County of San Francisco*, 594 U.S. 474 (2021)
- *Hodel v. Irving*, 481 U.S. 704 (1987)

2. Whether Amendment 104 to the Arkansas Constitution, which singled out Appellants for disfavored treatment relative to similarly situated casino operators in the state, unconstitutionally treated Appellants as a disfavored class of one under the Equal Protection Clause of the Fourteenth Amendment.

- *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)
- *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002)
- *Romer v. Evans*, 517 U.S. 620 (1996)
- *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985)

**INTRODUCTION**

The Cherokee Nation and the State of Arkansas reached a deal:  Arkansas would issue the Cherokee Nation's commercial arm a license to operate a casino in Pope County, Arkansas, pursuant to a recent state constitutional amendment allowing gambling.  In exchange, the Cherokee Nation would spend hundreds of millions of dollars not only building the casino, but investing in critically needed economic development initiatives within Pope County.  The Cherokee Nation kept its side of the bargain.  The state reneged.  After the state issued the license to the Cherokee Nation's commercial arm (hereinafter, collectively referring to all Appellants, "CNB"), and after work on the casino was well underway, the state did an about-face, snatching back the license without paying CNB a cent, let alone just compensation.  The district court correctly recognized that Arkansas' bait-and-switch was a "deep unfairness."  In fact, it was all that and a violation of the Takings and the Equal Protection Clauses of the United States Constitution.

When states wish to take private property, the Constitution circumscribes their options.  Any taking must be in support of a "public use," and it must be accompanied by a payment of "just compensation."  U.S. Const. amend. V.  Arkansas flunked both requirements here.  First, Arkansas' decision to eliminate CNB's valuable casino license was in furtherance of an agenda of economic protectionism, a quintessential *private*, not public, use:  Arkansas abolished CNB's

license to protect the pocketbook of an out-of-state casino operator (a business rival of CNB's) that perceived the new license as a threat to its business. Second, even if Arkansas had taken CNB's license in support of a public use, it would still need to pay CNB just compensation—which it never did.

Instead of resolving CNB's Takings Clause claim on the grounds the parties advanced, the district court struck out on its own—and went badly astray in the process. Despite uncontested evidence showing that Amendment 104 (the legal vehicle that stripped CNB of its license) was motivated by protectionism and animus, the district court concluded that the actual motivation for Amendment 104 was irrelevant and that it could uphold the taking so long as any hypothetical, rational justification could be mustered. But Arkansas itself never made that argument or invoked rational-basis precedents, and for good reason: The Supreme Court has been clear that the public-use analysis differs from rational-basis review, and is concerned with actual, not hypothetical, motivation.

When it came to CNB's just-compensation claim, the district court compounded the error. The court held that it could not reach the merits at all because CNB had not gone through state administrative proceedings before coming to federal court. But that exhaustion requirement has no basis in the Constitution; in fact, the Supreme Court has rejected just such a rule twice in the past five years alone.

The district court likewise erred in rejecting CNB's Equal Protection Clause claim. The state constitutional amendment that allowed gaming in Pope County also allowed gaming in three other Arkansas locations. Licenses were granted for all four. Arkansas then turned around and took CNB's license—but only CNB's license; the other three remain in the licensees' hands. Arkansas' decision to single out CNB for special, disfavored treatment by abolishing its casino license while leaving its peers' licenses intact cannot be squared with the requirements of equal protection in general or the prohibition of mistreatment of a disfavored "class of one" in particular. Here again, the district court rejected CNB's claim on the ground that, regardless of Arkansas' actual motive, someone could have had a rational basis for the singling out. That holding turns the law on its head: When it comes to class-of-one claims, the Supreme Court has made clear that district courts cannot rely on pretextual justifications that paper over true motivations of protectionism and animus.

Whichever way the Court looks at it, the district court's reasoning was profoundly mistaken. Not everything that is unfair is unconstitutional, but the Constitution expressly protects against the specific unfairness of saddling a single entity with burdens that should be borne by the public at large and visiting hardship on a class of one. The district court recognized the deep unfairness of what happened here but dismissed it by crafting new rules—some never raised by the parties, some

repeatedly rejected by the Supreme Court. That was error, and it sets a dangerous precedent that not only destroys CNB's legitimate, investment-backed expectations, but will haunt the state the next time it seeks a partner willing to invest hundreds of millions in the state. This Court should not allow the district court's decision to stand.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. CNB Successfully Bids for an Arkansas Casino License to Support the Cherokee Nation's Education and Healthcare Initiatives.

1. The Cherokee Nation is a "quasi-sovereign nation[]" responsible for the wellbeing of nearly half a million people. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 71 (1978); J.App.489, R.Doc.134 at 72:9-11. As part of its efforts to fulfill that solemn duty, the Cherokee Nation offers its people a host of public services, ranging from education to healthcare and beyond. J.App.489, R.Doc.134 at 72:6-9. And like many other tribal nations, it relies on commercial ventures to supplement its tax revenues and supply much-needed funds to finance those critical public services.

The Nation conducts these commercial ventures the same way as millions of Americans: through a separate business entity called Cherokee Nation Businesses, LLC. J.App.435, R.Doc.134 at 18:2-4. Cherokee Nation Businesses acts as a holding company for upwards of 30 wholly owned subsidiaries employing 10,000 people across 25 states and two dozen foreign countries. J.App.431, 434, R.Doc.134

at 14:2-8, 17:4-11.  Its subsidiaries operate in diverse industries—"everything from intelligence, defense logistics, cybersecurity services," operation of "historic properties," and, as relevant here, casino gaming.  J.App.432, 433, R.Doc.134 at 15:18-25, 16:16-20.  The profits from these ventures, including casinos, return to the Nation's treasury, where they are used to fund projects like "the construction of a brand new hospital," "career training for Cherokee citizens," and more.  J.App.434, R.Doc.134 at 17:14-25.  Cherokee Nation Businesses' casino operations are not all fun and games—they are a literal lifeline for hundreds of thousands of Cherokees who rely on the services they support.

Most relevant among Cherokee Nation Businesses' subsidiaries are Cherokee Nation Enterprises, LLC ("CNE"), and Legends Resort & Casino, LLC ("Legends"), both of which Cherokee Nation Businesses wholly owns.  CNE owns and operates 11 casinos across Oklahoma and Mississippi.  J.App.433, R.Doc.134 at 16:18-20.  CNE's gaming ventures are a significant contribution to the treasury of the Cherokee Nation:  All told, they make up 40% of the profit Cherokee Nation Businesses is able to remit to the Nation each year.  J.App.434, R.Doc.134 at 17:18-20.  Legends, meanwhile, was established under the laws of Arkansas to serve as a local entity for conducting the Nation's commercial ventures.  J.App.431, R.Doc.134 at 14:16-22; *see also* J.App.431, 481, R.Doc.134 at 14:13-15, 64:4-8.  Legends' Board of Directors is Cherokee Nation Businesses' Board of Directors, J.App.484, R.Doc.134

at 67:14-21, and it has no money of its own; it is funded entirely by Cherokee Nation Businesses out of a central treasury, J.App.513, R.Doc.134 at 96:19-24. As a result, Legends (unlike CNE) has never generated any revenue. J.App.513-14, R.Doc.134 at 96:25-97:2.

2. In 2018, Arkansas voters passed Amendment 100, the Arkansas Casino Gaming Amendment of 2018, which changed the state constitution to authorize "[c]asinos and casino gaming … in the State of Arkansas." Ark. Const. amend. 100, §3(a).[1] To effectuate this change, Amendment 100 conferred on the Arkansas Racing Commission the authority to "administer and regulate casino licenses, including their issuance and renewal." *Id.* §4(a). The Commission was also required to promulgate rules for "suspending or terminating casino licenses held by casino licensees that violate the provisions of [the Amendment] or the rules adopted under [it]." *Id.* §4(e)(8).

The Commission began accepting casino-license applications in June 2019. *Id*. §4(f). Critically, the Commission was authorized to issue only four licenses: one each to the owners of the horse and greyhound racing tracks and gaming facilities in Crittenden and Garland Counties, respectively, *id.* §4(j), (o); and one for a casino to operate in each of Pope and Jefferson Counties, *id.* §4(k).

---

[1] For the Amendment's original 2018 text, *see* Ark. Sec'y of State, Notice for Constitutional Amendment Proposed By Petition of the People, https://perma.cc/2V6Q-VVHX.

To compete for the Pope County license or the Jefferson County license, an applicant had to demonstrate that it had "experience conducting casino gaming" and to produce "a letter of support from the county judge or a resolution from the quorum court in the county." *Id.* §4(m)-(n). Once a license was issued, the licensee was "required to conduct casino gaming for as long as [it] ha[d] a license." *Id.* §4(*l*). And once the license was conferred, the Commission had no discretionary role in the renewal of the license—it was required to renew each license if the licensee complied with Amendment 100's terms, including payment of the renewal fee. *Id.* §4(q).

3. After Amendment 100 was passed, CNB decided to pursue the Pope County license. That decision was motivated in part by business considerations: Pope County was "a premium site from a casino standpoint," as its location would make CNB the only entity with a casino within an hour in any direction. J.App.549, 551, R.Doc.134 at 132:23-24, 134:19. The site was also easily accessible to visitors, and home to an important population center. J.App.435, R.Doc.134 at 18:15-16, 21-22. It was, in one expert's words, "an absolutely fantastic site" for a casino. J.App.551, R.Doc.134 at 134:20. All that made the Pope County license "a very juicy opportunity." J.App.550, R.Doc.134 at 133:2. But CNB was also motivated by historical ties to the Pope County community—the Cherokee Nation had been

present in Pope County as far back as the 1780s and, at one point, had occupied a reservation there.  J.App.435, R.Doc.134 at 18:17-21.

Throughout the first half of 2019, CNB sought a letter of support from the Pope County community in accordance with Amendment 100.  J.App.436, R.Doc.134 at 19:7-9.  It negotiated with County Judge Ben Cross to decide on terms for an Economic Development Agreement that would satisfy the local community.  J.App.436, R.Doc.134 at 19:7-18.  The goal was to "ensure the maximum amount of investment into the county and provide a venue that … represented Pope County in a favorable light."  J.App.437, R.Doc.134 at 20:1-4.  The final agreement committed CNB to build a venue worth at least $225 million, featuring a 200-room hotel, indoor and outdoor entertainment venues, and a water park for the local community—by far the largest investment in Pope County since the construction of the local nuclear power plant, which began operation over 50 years ago.  J.App.437, R.Doc.134 at 20:4-11.  The agreement also pledged CNB to transfer upward of $38 million to the county for various economic initiatives.  J.App.510-11, R.Doc.134 at 93:22-94:7.  In exchange, the county agreed to provide CNB with a letter of support for its bid for the Pope County license, and to provide no other competitor with such a letter.  J.App.437, R.Doc.134 at 20:17-23.  Not wanting to risk this massive investment, Pope County agreed to leave CNB as the sole qualifying applicant for the license.  J.App.437-38, R.Doc.134 at 20:24-21:3.

Although CNB was awarded its license, errors on the state's part delayed its issuance. The state initially issued a license to both Legends *and* CNB in 2021. J.App.443, R.Doc.134 at 26:19-23. But that license was ultimately defective because the only party to actually *apply* for the license had been Legends, not CNB. J.App.488, R.Doc.134 at 71:14-16. After lengthy litigation, the Arkansas Supreme Court ruled that the state's clerical error had rendered the license void. J.App.488, R.Doc.134 at 71:14-16. Desiring to avoid any other errors, everyone started the application process from scratch. CNB went through the entire application process a second time, applying under the name of CNE alone. J.App.444, R.Doc.134 at 27:6-14. This time, the state avoided any clerical errors, issuing CNB a proper casino license in June 2024—some three years after CNB initially applied. J.App.441, 443, 444, R.Doc.134 at 24:8-10, 23-24, 26:19-23, 27:6-14.

### B. Arkansas Unexpectedly Revokes CNB's Casino License to Support CNB's Oklahoma-Based Business Competitor.

1. Having obtained its casino license, CNB set to work preparing for the construction of the Pope County casino. It bought land in Pope County to support a casino, parking lots, and other ancillary facilities. J.App.458, R.Doc.134 at 41:7-16. Ultimately, CNB acquired approximately 325 acres, which it patched together at considerable expense from at least 15 different parcels from individual owners. J.App.475, 484, R.Doc.134 at 58:1-8, 67:3-4.

2. During that time, Arkansas voters proposed Amendment 104 to the state constitution. Amendment 104 would do two principal things. It would eliminate the constitutional authorization for a casino in Pope County and revoke the existing Pope County casino license, which CNB held. Ark. Const. amend. 104, §§1-2.[2] It would also prohibit the issuance of any future casino licenses without a special, countywide referendum of the county in which the casino was to be situated. *Id.* §3.

The campaign to enact Amendment 104 was spearheaded by a group called Local Voters in Charge ("LVC"). *E.g.*, J.App.774, R.Doc.135 at 357:21-24. But behind LVC was the Choctaw Nation of Oklahoma ("Choctaw Nation"), CNB's business rival, which operated a competing casino just across the Oklahoma state line. *See* J.App.555, R.Doc.134 at 138:16-18. Choctaw Nation directed LVC's activities behind the scenes, sharing lawyers with LVC, J.App.785, R.Doc.135 at 368:17-23, providing direction to LVC, *e.g.*, J.App.854, R.Doc.135 at 437:14-18, and sending LVC funding and support to ensure Amendment 104 was passed, J.App.456, R.Doc.134 at 39:1-2; J.App.852, R.Doc.135 at 435:20-25. All told, Choctaw Nation spent nearly $17 million to ensure the passage of Amendment 104, more than any other entity had *ever* spent on a ballot referendum in the history of Arkansas. J.App.719, R.Doc.135 at 302:2-15; *see also* J.App.711-12, R.Doc.135 at 294:23-295:2. That made it the near-exclusive funder of LVC (and thus Amendment

---

[2] For the Amendment's original 2024 text, *see* https://perma.cc/2C7S-J8G3.

104), apart from a single donation of $100 by another individual. J.App.759-60, R.Doc.135 at 342:22-343:5. And while Choctaw Nation shared its lawyers and other assets with LVC, those lawyers declined to formally "clarify a distinction" between their representation of Choctaw Nation and of LVC. J.App.853, R.Doc.135 at 436:9-17. Instead, the lawyers blurred the lines between the groups, representing one and the other jointly the entire time.

Choctaw Nation's motivation for sponsoring Amendment 104 is not hard to divine. The new Pope County casino was projected to draw $11.79 million in business away from Choctaw Nation's casino annually, J.App.609, R.Doc.134 at 192:22-23, which made Choctaw Nation "very interested in removing the Pope County casino license," J.App.456, R.Doc.134 at 39:1-2; J.App.855, R.Doc.135 at 438:10-14. In addition, Arkansas residents spent $17.2 million on casino gaming in Oklahoma each year that stood to be redirected back toward Arkansas if the Pope County casino were built. J.App.638, R.Doc.134 at 221:3-8. So Choctaw Nation used LVC to help undermine CNB's efforts—and to protect its own business interests.

LVC went to great pains to obscure the true effect of and intent behind Amendment 104. It "specifically avoided suggesting that Amendment 104 would curb casino gaming" in Arkansas. J.App.797, R.Doc.135 at 380:13-25. It likewise avoided informing voters that Amendment 104 would eliminate an existing casino

license, let alone the one in Pope County. J.App.798, R.Doc.135 at 381:1-17. This campaign of obfuscation had its intended effect: Amendment 104 passed in November 2024. Notably, however, a majority of Pope County voted *against* Amendment 104. J.App.783, R.Doc.135 at 366:15-17. So while Amendment 104 purported to promote local control, it did the opposite, taking away from Pope County the prospect of a new casino (and the economic development to accompany it) even though a majority of the county's residents favored retaining the casino.

3. Amendment 104 had an immediate effect. It forced CNB to halt work toward construction of its casino, for fear of running afoul of the state's criminal prohibition on unlicensed casino operation. It also destroyed the value of the land CNB had acquired to build its casino. J.App.474, R.Doc.134 at 57:3-14. Because that land could no longer be used for the casino, its sole economically viable uses were "as pasture" or to be held in reserve "for future development." J.App.474 R.Doc.134 at 57:8-10. "[L]and for special permitted use like a casino" has a much higher fair market value than that which is used for "agriculture." J.App.515-16, R.Doc.134 at 98:24-99:4. Consequently, when the Pope County license was abolished, the value of CNB's land holdings massively decreased. J.App.474, R.Doc.134 at 57:11-14. At this point, CNB was out not just its casino license, but millions of dollars more in depressed real estate values and wasted progress toward building the Pope County casino.

## II.   Proceedings Below.

1. On November 8, 2024, just three days after Amendment 104 passed, CNB sued Arkansas in federal district court.[3]   J.App.1-43, R.Doc.1.   CNB's complaint alleged that Amendment 104 violated the Contracts Clause, Due Process Clause (in both its procedural and substantive components), Takings Clause, Equal Protection Clause, and Bill of Attainder Clause of the federal Constitution.   J.App.212-400, R.Doc.46.   As relief, CNB asked that Amendment 104 be permanently enjoined, that the district court enter a declaratory judgment declaring Amendment 104 unconstitutional, and that the court order Arkansas to pay CNB just compensation for its casino license under the Takings Clause.   J.App.248-49, R.Doc.46 at 37-38. Alongside that complaint, CNB moved for a temporary restraining order and preliminary injunction, seeking to prevent Amendment 104 from going into effect the following week.   J.App.44-46, R.Doc.2.

After a hearing, the district court "reluctantly denied" CNB's motion for a temporary restraining order or preliminary injunction, though it acknowledged that Arkansas' bait-and-switch was a "deep unfairness."   J.App.94-95, R.Doc.19; J.App.201, 202, R.Doc.33 at 106:20-21, 107:7-8.   The court also dismissed on

---

[3] CNB later amended its complaint to add as defendants Governor Sarah Huckabee Sanders in her official capacity, the Arkansas Racing Commission, and each of its members in their official capacities. *See generally* J.App.47-93, R.Doc.11 (first amended complaint); J.App.212-400, R.Doc.46 (second amended complaint).

Eleventh Amendment grounds CNB's claims against the state and the Commission. J.App.201, R.Doc.33 at 106:8-12. However, the court allowed CNB's claims against the Governor and members of the Commission in their official capacities to proceed. J.App.201, R.Doc.33 at 106:12-14.

2. Arkansas then moved to dismiss CNB's complaint, J.App.401-02, R.Doc.67, and the district court partially obliged, J.App.403-17, R.Doc.105.

First, the court dismissed CNB's Takings Clause claim insofar as that claim alleged that Amendment 104 unconstitutionally took CNB's casino license for a non-public use—namely, economic protectionism of CNB's out-of-state business rival. J.App.410, R.Doc.105 at 8. To get to that result, the court began by (re)characterizing public-use analysis as simply another form of rational-basis review, J.App.410, R.Doc.105 at 8. And, under rational-basis review, the court found that it was free to ignore the *actual* motivation behind Amendment 104, so long as there existed some "reasonably conceivable justification" for the amendment. J.App.415, R.Doc.105 at 13. Having so recharacterized CNB's claim, the district court found a "conceivable justification" for Amendment 104 in the state's "legitimate interest in regulating gambling, including its expansion and contraction." J.App.415, R.Doc.105 at 13. It therefore dismissed CNB's non-public-use Takings Clause claim on the ground that this hypothetical motivation would be a permissible public use. J.App.410, 414-17, R.Doc.105 at 8, 12-15.

The district court likewise dismissed CNB's claim that Amendment 104 violated CNB's procedural due process rights. J.App.414, R.Doc.105 at 12. Even though the Amendment affected only CNB's interests—because it extinguished only CNB's casino license—the district court deemed it a "legislative act equally affecting all those similarly situated." J.App.414, R.Doc.105 at 12. Having deemed it ordinary, general legislation, the court concluded that Amendment 104 afforded CNB the only process it was due through the "[t]he referendum process." J.App.414, R.Doc.105 at 12. The court therefore rejected CNB's allegations about the manner in which Amendment 104 singled out CNB for special, disfavored treatment and summarily dismissed CNB's procedural due process claim in a single paragraph. J.App.414, R.Doc.105 at 12.

The district court also dismissed CNB's Equal Protection Clause and substantive due process claims on the ground that both claims only required Amendment 104 to survive rational basis review, which the district court said it did. J.App.414-17, R.Doc.105 at 12-15. Because states have a "legitimate interest in regulating gambling," J.App.415, R.Doc.105 at 13, the court deemed irrelevant CNB's specific allegations that the real motivation for Amendment 104 was irrational animus toward CNB and support for its out-of-state business competitors. According to the district court, "[w]hat actually motivated Amendment 104 is 'entirely irrelevant for constitutional purposes.'" J.App.415, R.Doc.105 at 13.

Having decided that Amendment 104 was passed in pursuit of a legitimate governmental objective, the district court concluded that the Amendment, though "odd," rationally served the end of regulating gambling. J.App.416, R.Doc.105 at 14.

The district court therefore dismissed each of CNB's "procedural due process, substantive due process, equal protection, and takings based on no public use" claims. J.App.417, R.Doc.105 at 15. However, it permitted the remaining claims under the "Contracts Clause[,] … Takings Clause (just compensation), and Bill of Attainder Clause" to proceed to trial. J.App.417, R.Doc.105 at 15.

3. The district court held a three-day bench trial the following week. *See* R.Doc.115; R.Doc.117; R.Doc.118. Following trial, the court entertained post-trial briefs from both sides, before ultimately ruling for the Defendants on CNB's remaining claims.

The district court first concluded that, while CNB had standing to press its Contract Clause claim, J.App.1150-51, R.Doc.139 at 17-18, that claim failed because CNB and its counterparties should have been aware of the possibility that the Pope County casino would not end up being built. That, the court found, was a "calculated business risk" that simply failed to pay off. J.App.1154-55, R.Doc.139 at 21-22. The Economic Development Agreement that CNB formed with Pope County could not support a Contracts Clause claim, the court held, because it did not

yet "obligate the Cherokee to do anything." J.App.1155, R.Doc.139 at 22. Thus, for one reason or another, the district court found that none of CNB's contracts could support a meritorious Contracts Clause claim.

The court next turned to CNB's Takings Clause claim for just compensation. Although it noted that the parties had vigorously disputed whether the casino license constituted property for purposes of the Takings Clause, as well as whether the Takings Clause was self-executing and whether the state's Eleventh Amendment immunity barred CNB's Takings Clause claim, the court declined to address any of those questions. Instead, it dismissed CNB's claim on the ground that CNB had failed to exhaust its state administrative remedies by seeking compensation from the Arkansas State Claims Commission (an administrative tribunal limited to awarding at most $15,000 without legislative approval, Ark. Code §25-44-215(a)) before resorting to federal court. J.App.1159, 1162, R.Doc.139 at 26, 29 ("[I]t would be premature and imprudent for this Court to decide whether the Takings Clause itself provides a cause of action for damages before the Cherokee have availed themselves of that state remedy."). *But see Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 480 (2021) (making clear that "administrative 'exhaustion of state remedies' is not a prerequisite for a takings claim").

The court likewise dismissed CNB's Bill of Attainder Clause claim, reasoning that Amendment 104 had not "single[d] out CNE for punishment," even though it

specified the Pope County license (which only CNE held) by name. J.App.1162, R.Doc.139 at 29. The court also concluded that Amendment 104's legislative confiscation of CNE's property did not qualify as "punishment" for Bill of Attainder Clause purposes, even though the effect of that confiscation was to render any casino operations by CNB criminally culpable. J.App.1163-64, R.Doc.139 at 30-31. Thus, the court concluded, it did not qualify as a bill of attainder for constitutional purposes. J.App.1163-65, R.Doc.139 at 30-32.

The district court entered final judgment on August 28, 2025. J.App.1165, R.Doc.139 at 32. This appeal timely followed. J.App.1167-68, R.Doc.141.

## STANDARD OF REVIEW

"After a bench trial, this court reviews legal conclusions de novo and factual findings for clear error." *Urban Hotel Dev. Co. v. President Dev. Grp., L.C.*, 535 F.3d 874, 879 (8th Cir. 2008). "Under the clearly erroneous standard," this Court will not sustain factual findings that are "not supported by substantial evidence in the record," that are "based on an erroneous view of the law," or that leave the Court "with the definite and firm conviction that an error was made." *Roemmich v. Eagle Eye Dev., LLC*, 526 F.3d 343, 353 (8th Cir. 2008). Dismissals for failure to state a claim are reviewed de novo. *Atkinson v. Bohn*, 91 F.3d 1127, 1128 (8th Cir. 1996) (per curiam).

## SUMMARY OF ARGUMENT

In 2018, Arkansas voters approved Amendment 100 to the state constitution, authorizing the state to issue licenses to conduct casino gaming. One of those licenses went to CNB, which for months had earned substantial local support in Pope County, including by planning a substantial commitment of funds to promote the economic development of the area. But once the license was in hand, land was purchased, and preparations to build the casino were underway, the state reneged via Amendment 104, which modified Amendment 100 to revoke CNB's—and only CNB's—license. The state attributed this sudden change to a newfound concern (apparently absent six years prior and found nowhere else) about casino gaming in the state, even though the other casino licenses issued pursuant to Amendment 100 remained intact. But the facts tell a darker story. The target was not casino gambling in general, but CNB's license in particular, and the beneficiary was not the citizens of Arkansas—and certainly not the citizens of Pope County who supported the casino and opposed Amendment 104—but a rival casino owner, across the Oklahoma state line.

Arkansas' sudden revocation of CNB's license is not just a "deep unfairness," J.App.190-91, 202, R.Doc.33 at 95:24-96:7, 107:7-10; it is an unconstitutional bait-and-switch that violated CNB's fundamental rights. Most obviously, by eliminating CNB's property interest in its casino license for the benefit of another private entity

and without compensation, Amendment 104 violated the Takings Clause twice over. The state's power to take private property may be exercised only in furtherance of a "public use," U.S. Const. amend. V, which the Supreme Court has repeatedly explained does not include benefiting another private entity. If Arkansas simply took CNB's license and handed it to Choctaw Nation, it would plainly violate the Takings Clause. Obliterating CNB's license at the behest of and for the benefit of Choctaw Nation should fare no better. And even if the state was pursuing a public interest, it could only take CNB's property if it provided just compensation, which it refused to do.

Arkansas' constitutional violations did not end with the Fifth Amendment. The state also violated the Equal Protection Clause by singling out CNB for revocation of its casino license while leaving its peers' licenses untouched. CNB and the other licensees were similarly situated in every salient respect, but the state chose to eliminate CNB's, and only CNB's, license. That makes this a classic class-of-one case, where the state cannot impose hardships on a single entity based on concerns that should have led it to treat all similarly situated entities alike. That kind of singling out and animus is unconstitutional and cannot be justified by alternative theories. Animus remains an impermissible basis for government action. Thus, the state violated not only the Equal Protection Clause, but the substantive component of the Due Process Clause too, which prohibits arbitrary government action.

The district court's grounds for rejecting these arguments were wrong at every turn. Rather than address CNB's Takings Clause claim on the merits, the district court dismissed the claim based on a supposed state administrative exhaustion requirement that the Supreme Court has twice rejected in just the past five years. And as for the Equal Protection Clause, the district court simply waved away CNB's claim, insisting that the Pope County license was somehow distinguishable from the three other licenses that were created by the very same piece of legislation.

Ultimately, whichever way the Court looks at it, Amendment 104 flagrantly violated the United States Constitution and CNB's rights under it. The district court should have enjoined Arkansas' taking and directed it to recognize that CNB continued to possess a license to conduct casino gaming operations in the state. Or, at the very least, it could have ordered Arkansas to pay CNB just compensation for the value of that license. What it could not do is exactly what it did: deny CNB's claims and cast Arkansas' unconstitutional law as nothing more than a mere "deep unfairness" to CNB. *See* J.App.201, 202, R.Doc.33 at 106:21, 107:7-8. This Court should reverse.

## ARGUMENT

## I.  Amendment 104 Violates The Takings Clause By Depriving CNB Of Its Vested Property Rights Without Compensation.

The Constitution bars states from taking private property, except under certain limited conditions: States may take property only in furtherance of a "public use"—

and, even then, only when they pay the owner "just compensation." U.S. Const. amend. V; *see Dolan v. City of Tigard*, 512 U.S. 374, 383 (1994) (recognizing incorporation). Arkansas violated that simple command twice over. It stripped CNB of valuable property (its casino license) in dramatic fashion, abolishing the property interest altogether—without paying CNB a cent. And it did so for a private, rather than public, purpose. The district court waved away that double threat to property rights by dismissing CNB's claim based on an administrative-exhaustion requirement the Supreme Court has repeatedly rejected. This Court should correct that error and reaffirm that if Arkansas wants to abolish property rights, it must do so for a public purpose—and provide just compensation.

A.  **Extinguishing CNB's Casino License Without Compensation Violated the Takings Clause Twice Over.**

The Constitution gives states a choice when it comes to private property: States maintain eminent domain authority—but if they opt to exercise that awesome power, the Fifth Amendment's Takings Clause sets stringent requirements. States may "take[]" "private property" only in furtherance of a "public use," and only if they pay the property owner "just compensation." U.S. Const. amend. V.

1.  **Arkansas abolished CNB's valuable property interest, but paid no—let alone "just"—compensation for what it took.**

States can "take[]" private property in all sorts of ways. Perhaps the most familiar methods are seizing chattel, physically occupying real property, and formal

condemnation actions. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021). Here, however, Arkansas chose a more dramatic option: It simply abolished CNB's property interest altogether. *See Hodel v. Irving*, 481 U.S. 704, 717-18 (1987) (recognizing "complete abolition" of a property interest as a taking); *see also Nekrilov v. Jersey City*, 45 F.4th 662, 685 (3d Cir. 2022) (Bibas, J., concurring) (historically, "[t]he revocation of a franchise … was treated as a compensable taking 'on the theory that the revocation was a seizure of intangible property'"); William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 792 n.56 (1995) (collecting cases). Through Amendment 100 and the process it established, CNB was granted a license to build and operate a casino in Pope County. *See* J.App.441, R.Doc.134 at 24:4-10. Once CNB had that license, certain rights vested in it—most notably, CNB could now conduct casino gaming operations in Arkansas without fear of criminal prosecution. (Gambling is otherwise illegal in Arkansas.) But Amendment 104 abolished that casino license, eliminating CNB's valuable property interest and the attendant rights accompanying it. Ark. Const. amend. 104, §2. This "complete abolition" of CNB's property constituted a taking for which the Fifth Amendment requires "just compensation." *Hodel*, 481 U.S. at 717-18. Yet compensation never came.

According to Arkansas, it had no duty to pay CNB because (the state said) the casino license was not a property interest at all. *E.g.*, R.Doc.7 at 14-16. The district court did not address this argument—and for good reason: It is plainly wrong.

The state's theory derives largely from an Arkansas Racing Commission regulation providing that "[a] Casino license is a revocable privilege, and no holder thereof shall be deemed to have acquired any vested rights therein or thereunder." R.Doc.7 at 15 (quoting Ark. Casino Gaming R. 4.040 (codified at 23 Ark. Code R. §358-406(a)). But Rule 4.040 does not define the scope of property interests in casino licenses. It simply reaffirms the basic proposition that violation of the gaming rules can result in revocation of a license. And just because a property interest is defeasible does not make it not property. "An interest amounting to less than *all* of the proverbial 'bundle of sticks' is nonetheless a protected property interest." *Dixon v. Lowery*, 302 F.3d 857, 863 n.2 (8th Cir. 2002). A leasehold may be extinguishable if, for instance, the lessee commits a crime on the premises. But if the state destroys the building during the life of the lease, and the lessee committed no crimes, then she is entitled to just compensation for that which was taken. So too here.

In arguing to the contrary, the state relied on *Sarlo v. Pulaski County*, 88 S.W. 953 (Ark. 1905), which held that liquor licenses were "mere privilege[s], revocable at the will of the state," and therefore subject to revocation at the state's will. *Id.* at 954. But *Sarlo* has long since been overtaken. Its pronouncement that licenses were

"mere privilege[s]" for which "[c]onstitutional limitations … cannot be invoked" relied on the fact that, at the time, the state possessed plenary power to "revoke, annul, or modify the license" or to "create conditions, limitations, and regulations subsequent to its issue burdening its exercise" at will. *Id.* That is no longer the case. Today, the Arkansas Administrative Procedure Act, enacted subsequent to *Sarlo* (but long before Amendment 100), eliminated the state's at-will control over licenses. Ark. Code §25-15-211(c); *see also id.* §3-2-212 (extending such protections to liquor licenses). And unlike the liquor license in *Sarlo*, CNB's casino license here was subject to a reticulated administrative scheme governing and limiting the state's ability to rescind the license. *See generally* 23 Ark. Code R. pt. 358, subpt. 4; *see also* Ark. Code §25-15-211(c). Under those conditions, Arkansas simply lacks the control over licenses that was necessary to support the *Sarlo* court's holding.

Arkansas law not only authorized CNB to possess and use its casino license; it affirmatively required it. Ark. Const. amend. 100, §4(*l*). And CNB naturally had the right to exclude others from using the license, as the license was a (lawful) monopoly on the conduct of casino operations in Pope County. *See id.* §4(k). Similarly, Arkansas law authorized CNB to "sell, transfer, or otherwise dispose of its license to another person or entity who demonstrates casino gaming experience," provided that the Arkansas Racing Commission approved. 23 Ark. Code R. §358-217(b). Under "traditional property law principles"—the ultimate touchstone in

26

determining whether an interest comes within the ambit of the Takings Clause—those are all attributes of property, not mere privileges. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023); *see also Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 440 (8th Cir. 2007) (ability to sell, assign, or transfer a license is consistent with property interest, not a mere privilege subject to destruction).

Furthermore, Amendment 100 authorized revocation of casino licenses only on limited grounds, namely, "violat[ions of] the provisions of this Amendment or the rules adopted under" it. Ark. Const. amend. 100, §4(e)(8). Even when a license revocation is for those reasons, Arkansas law requires that the licensee be given pre-deprivation notice and "an opportunity to show compliance with all lawful requirements for the retention of the license." Ark. Code §25-15-211(c); *see also* J.App.652, 653-54, R.Doc.135 at 235:1-3, 236:13-237:14 (expert on "regulatory gaming" and "expectations of licensees"). These protections gave CNB reasonable assurance that it would "be relatively undisturbed … in the possession of" its license. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435-36 (1982).

That assurance was reinforced by the fact that license revocations are exceptionally rare. At trial, Robert Ruben, CNB's expert on "regulatory gaming throughout the United States," J.App.651-52, R.Doc.135 at 234:25-235:3, testified that, despite having practiced casino gaming law for 32 years, J.App.648, R.Doc.135 at 231:9-12, he had only ever seen a single license be revoked, J.App.655, R.Doc.135

at 238:10-11.  That is because license revocation is "the most draconian measure," "reserved for the most egregious[] … of situations."  J.App.653, R.Doc.135 at 236:22-24.  As a result, CNB—and casino licensees like it—had not only "a reasonable expectation … to maintain th[e] license," but also "to renew it at the end of the term."  J.App.660, R.Doc.135 at 243:22-24.

In sum, CNB had a clear property interest in its license.  Arkansas' decision to extinguish the license, without any compensation, violated the Constitution.

### 2. Even if Arkansas paid up, its taking would still be unconstitutional, given its purely private motivation.

Arkansas' failure to compensate CNB for the valuable license it extinguished was not the only Takings Clause problem with Amendment 104.  Generally, states may take private property for all sorts of different uses, provided they pay just compensation.  But even if states pay in full for what they take, the Takings Clause still squarely forbids taking private property "for the purpose of conferring a private benefit on a particular private party."  *Kelo v. City of New London*, 545 U.S. 469, 477 (2005).  Yet that is precisely what Amendment 104 did.

Amendment 104 was only the latest in a series of efforts by Choctaw Nation to suppress CNB, its business rival.  Whether on its own or through LVC and its predecessors, Choctaw Nation repeatedly sought to obstruct casino growth in western Arkansas to protect the profits of its casino on the Arkansas-Oklahoma border.  *See* pp.11-13, *supra*.  The Pope County casino that Amendment 100

authorized stood to reduce Choctaw Nation's annual casino profits by nearly $12 million. J.App.609, R.Doc.134 at 192:21-23. So, Choctaw Nation financed the creation of LVC, hired local attorneys to represent both its and LVC's interests, and set out to obliterate CNB's license. *See* pp.11-13, *supra*.

If Amendment 104 had taken CNB's license and simply handed it to Choctaw Nation, the Takings Clause violation would be unmistakable. But Choctaw Nation did not need CNB's license, as it was trying to protect its own, existing casino across the state line. Thus, Amendment 104 sought to obliterate CNB's license for Choctaw Nation's benefit, rather than to transfer it. But that detail does not make the Takings Clause violation disappear. In either case, the "purpose" underlying Amendment 104 was the forbidden one of taking property for private use. Choctaw Nation, worried about its bottom line (and only its bottom line), induced the state to take CNB's property rights via Amendment 104, which "confer[red] a private benefit," *i.e.*, protection of its casino revenues, "on a particular private party," *i.e.*, Choctaw Nation. *Kelo*, 545 U.S. at 477. Amendment 104 is thus doubly unconstitutional.

The district court did not dispute CNB's account showing that Choctaw Nation's private interests motivated Amendment 104. It just deemed the real reasons for Amendment 104 irrelevant. In doing so, the court effectively reimagined the public-use requirement as requiring only a form of rational-basis review. J.App.410,

414-17, R.Doc.105 at 8, 12-15. That was manifest error. The Takings Clause demands more than a post-hoc alternative rationale for robbing Peter to pay Paul.

Unlike the rational-basis test that governs substantive due process challenges to ordinary economic legislation, the Takings Clause's public-use requirement is concerned with the *actual* purpose behind a taking of private property, not merely whether some conceivable rational justification could support it. *See, e.g.*, *Kelo*, 545 U.S. at 477-78 ("Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit."); *City of Cincinnati v. Vester*, 281 U.S. 439, 447 (1930) ("To the end that the taking shall be shown to be within its authority, the municipality is called upon to specify definitely the purpose of the appropriation."); *Missouri Pac. Ry. Co. v. Nebraska*, 164 U.S. 403, 416 (1896) (similar); *cf. Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 734 (8th Cir. 2019) ("To avoid collapsing the specific prohibition of the Contract Clause into the more general Due Process Clause, a reviewing court must require the State to demonstrate more than a conceivable or incidental public purpose for impairing the obligation of contracts.").

Indeed, even Justice Kennedy's concurrence in *Kelo*—on which the district court relied—recognized that "[a] court applying rational-basis review under the Public Use Clause should strike down a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits."

545 U.S. at 491 (Kennedy, J., concurring). That focus on the *actual* purpose behind the state's taking of private property reflects the fundamental difference between ordinary economic legislation, which is presumptively valid, and government action that actually takes private property, which at the very least *always* demands a remedy. That is why even Justice Kennedy would hold that "[a] court confronted with a plausible accusation of impermissible favoritism to private parties should treat the objection as a serious one and review the record to see if it has merit." *Id.*

But the district court refused to do even that much. It shrugged off CNB's showing of a motive of rank economic protectionism to favor one business rival over another by insisting that "[w]hat actually motivated Amendment 104 is entirely irrelevant for constitutional purposes," and that "any reasonably conceivable justification suffices." J.App.415, R.Doc.105 at 13. That cannot stand.

To be sure, this Court and the Supreme Court have, on occasion, used the term "conceivable" to refer to the purpose needed to support the defense that a taking was in support of a public use. *Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 241 (1984) ("conceivable public purpose"); *Dahlen v. Shelter House*, 598 F.3d 1007, 1012 (8th Cir. 2010) (same). But the district court fundamentally misunderstood those cases. Read in the light of the Supreme Court's consistent focus on the *actual* purpose behind a taking, *see, e.g.*, *Kelo*, 545 U.S. 478, cases like *Midkiff* and *Dahlen* plainly do not mean to smuggle state-friendly rational-basis review into the public-use

analysis, diluting the Takings Clause along the way. Rather, their references to a "conceivable purpose" impose an *additional* requirement: In the Takings Clause context, it is not enough that a state can come up with a legitimate explanation for the taking after the fact in litigation; the state's asserted purpose must actually be supported by the record—and must be more than mere pretext. Hence, in both *Dahlen* and *Midkiff*, the "conceivable public purpose" was the *actual* purpose of the taking. *Dahlen*, 598 F.3d at 1012; *Midkiff*, 467 U.S. at 241.

Here, however, there is a fundamental mismatch between the record (and reality) on the one hand and the supposed legitimate purpose for Amendment 104 on the other. Arkansas argued below that Amendment 104 was not advancing an agenda of economic protectionism, but rather increasing local control over casino gaming in the state and limiting the growth of casino gaming. R.Doc.30 at 17-21; R.Doc.81-1 at 4. But that asserted interest in local control found no support in the record evidence here, which instead revealed an impermissible private purpose of protecting an out-of-state business entity. *E.g.*, J.App.454-56, 609, R.Doc.134 at 37:19-39:2, 192:19-23; J.App.719, 758, 785-86, 833, 852-53, 855, R.Doc.135 at 302:2-9, 341:7-12, 368:17-369:16, 416:8-10, 435:20-436:20, 438:10-20; J.App.1000-01, R.Doc.136 at 583:22-584:3; *see also* J.App.783, R.Doc.135 at 366:15-17 (Pope County local community *opposed* elimination of casino license).

Nor still could a more general interest in limiting the spread of gambling pass muster. Far from limiting gambling, Arkansas is actively *encouraging* the expansion of gambling in the state. For instance, it has facilitated the massive expansion of sports betting by both authorizing casinos to offer sportsbooks for in-person betting and authorizing remote sports betting through phone apps and internet services. J.App.819, R.Doc.135 at 402:2-20; J.App.898, R.Doc.136 at 481:1-19. Meanwhile, the Arkansas Racing Commission has *no* active initiatives to curb or limit the spread of casino gaming, apart from Amendment 104. J.App.819, R.Doc.135 at 402:21-24. Indeed, when questioned at trial, one of the racing commissioners testified that he "hope[d]" "casino gambling at the three current casinos" would "increase in the future." J.App.818, R.Doc.135 at 401:4-9. By all appearances, then, literally the only policy in the state of Arkansas with the alleged purpose of limiting casino gaming is the termination of CNB's license. J.App.820, R.Doc.135 at 403:4-13. So Arkansas' supposed interest in limiting the spread of gambling in the state is a pretext—and a pretext good for this policy only, at that.

In all events, even if rational basis applies, Amendment 104 still fails muster. It would be bad (and unconstitutional) enough for a state to take private property in support of a business rival based in the state. But there is simply no rational basis for a state enacting an agenda of economic protectionism for the benefit of an out-of-state entity in which a state has no conceivable interest and that wants to draw

33

much-needed investment dollars away from the state.  *See* pp.45-48, *infra*.  Yet that is exactly what happened; after all, Choctaw Nation is located in Oklahoma, not Arkansas, and it operates its casino across the state line.  *See* J.App.784, R.Doc.135 at 367:15-24.  Under any standard of review, Amendment 104 violates the Takings Clause.

## B.     The District Court's Invented State Administrative Exhaustion Requirement Contravenes Binding Supreme Court Precedent.

The district court declined to address nearly all of CNB's Takings arguments on the theory that CNB could have, but did not, present its claims to the Arkansas State Claims Commission before suing.  J.App.1159, 1162, R.Doc.139 at 26, 29. That state administrative exhaustion requirement is squarely foreclosed by binding precedent.

1. The Supreme Court has made clear that "administrative 'exhaustion of state remedies' is not a prerequisite for a takings claim." *Pakdel*, 594 U.S. at 480.  Instead, "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick*, 588 U.S. at 185.  That claim "arises at the time of the taking, regardless of post-taking remedies that may be available." *Id.* at 190.  "The fact that the State has provided a property owner with a procedure that may subsequently result in just compensation cannot deprive the owner of his Fifth Amendment right to compensation under the Constitution, leaving only the state law right." *Id.* at 191.  In other words, property owners need

not "exhaust whatever administrative procedures a state imposes" or "receive state approval of their Takings Clause claims before filing in federal court," because "[a] property owner's compliance with state-imposed procedures is immaterial to the determination of whether a taking occurred." *Knellinger v. Young*, 134 F.4th 1034, 1044 n.4 (10th Cir. 2025); *accord In re Fin. Oversight & Mgmt. Bd. for P.R.*, 41 F.4th 29, 42 (1st Cir. 2022); *Conyers v. City of Chicago*, 10 F.4th 704, 710 (7th Cir. 2021); *Gearing v. City of Half Moon Bay*, 54 F.4th 1144, 1147-48 (9th Cir. 2022).[4]

The district court ignored *Knick* and *Pakdel*, seemingly reasoning that the Supreme Court's decision in *Devillier v. Texas*, 601 U.S. 285 (2024), overruled those cases *sub silentio*. *See* J.App.1159, R.Doc.139 at 26 (relying on *Devillier* for the proposition that "constitutional concerns do not arise when property owners have other ways to seek just compensation"); *see also* R.Doc.128 at 8. That badly misreads *Devillier*. In *Devillier*, the Supreme Court declined to answer the question whether the Takings Clause is self-executing (*i.e.*, whether it supplies its own cause of action) because the plaintiffs had a cause of action under state law instead. 601 U.S. at 292. In that context, there could be no "constitutional concern[]" because the Takings Clause could already be enforced in court—and in federal court, no

---

[4] To be sure, a taking may not yet have occurred if "avenues still remain for the government to clarify or change its decision." *Pakdel*, 594 U.S. at 480. But that goes to ripeness, not exhaustion, and is irrelevant here—Amendment 104 extinguished CNB's casino license, full stop. Nothing the Claims Commission could do would reinstate that license.

less—by way of the state cause of action. *Id.* ("[T]he absence of a case relying on the Takings Clause for a cause of action does not by itself prove there is no cause of action. It demonstrates only that constitutional concerns do not arise when property owners have other ways to seek just compensation."). But *Devillier* said nothing that so much as hinted that the existence of a state administrative remedy could foreclose an otherwise-viable Takings Clause claim. And, to state the obvious, the district court was not free to depart from *Knick* and *Pakdel*'s clear commands on this point based on its reading of what *Devillier* might portend. *See generally Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

Under *Knick* and *Pakdel*, this case is straightforward. The district court dismissed CNB's claim on the ground that CNB had failed to exhaust its state administrative remedies. *Knick* and *Pakdel* both foreclose that argument. *Knick*, 588 U.S. at 190-91; *Pakdel*, 594 U.S. at 480-81. On that ground alone, the judgment cannot stand.

2. Likewise, the district court's comment that state administrative remedies foreclose injunctive relief does not pass muster. J.App.1159-60, R.Doc.139 at 26-27. To be sure, if state courts are available to hear suits for just compensation, then a plaintiff may have an adequate remedy at law and therefore not be entitled to equitable relief. *Knick*, 588 U.S. at 200-01; *see Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 941-42 (8th Cir. 2023) ("[T]o determine whether equitable

36

relief is available to a property owner asserting a takings claim, a court must identify any alternative *cause of action* and examine the adequacy thereof." (emphasis added)). But that principle is plainly inapplicable here: The Arkansas state constitution provides the state, its officers, and its agencies with a blanket immunity from suit— including Takings Clause claims—in state court. Ark. Const. art. V, §20; *see Tri-B Advert., Inc. v. Ark. State Highway Comm'n*, 539 S.W.2d 430, 431 (Ark. 1976).

The availability of *nonjudicial* remedies, like resort to the Arkansas State Claims Commission, changes nothing. *Williams* limited itself to the availability of *judicial* remedies. 64 F.4th at 941. But even if nonjudicial remedies could foreclose injunctive relief, *Williams* requires courts to assess whether those remedies are actually adequate. *Id.* at 941-42 ("Thus, to determine whether equitable relief is available to a property owner asserting a takings claim, a court must identify any alternative cause of action and examine the adequacy thereof."). And, here, the Arkansas State Claims Commission cannot award more than $15,000 in compensation without legislative approval, Ark. Code §25-44-215(a), which would amount to a pittance compared to the $103.5 million value of CNB's casino license, J.App.1157, R.Doc.139 at 24. The possibility of recovering a hundredth of a percent of the value of CNB's license is plainly not enough to forestall injunctive relief.

Meanwhile, the district court's suggestion that CNB could render the Arkansas State Claims Commission's remedy adequate by simply seeking out a private bill from the legislature to pay out the remaining value of its license, J.App.1159, R.Doc.139 at 26, proves entirely too much. The legislature certainly *could* pass a private bill authorizing payment of just compensation. *See* Ark. Code §25-44-215(b); *see also Fulton v. Fulton Cnty. Bd. of Comm'rs*, 148 F.4th 1224, 1272, 1274-75 (11th Cir. 2025) (Pryor, C.J., dissenting). But it is *always* true that a legislature could, as an act of grace, repeal offending legislation or authorize a disbursement of funds to a victim of state wrongdoing. Taken seriously, the district court's argument would mean that injunctive relief would *never* be available to victims of government action, because it is always theoretically possible that the legislature could, in its munificence, pay out its debts to the would-be plaintiff. That is not the law.

In short, the district court's invocation of state-law remedies to defeat CNB's Takings Clause claim was entirely erroneous. On the damages side, it was squarely foreclosed by *Knick* and *Pakdel*. And on the injunctive side, it proves far more than even the most ardent defender of state takings power could defend.

* * *

Arkansas destroyed CNB's valuable property interest. Yet it paid CNB zero compensation. And to add insult to injury, Arkansas took CNB's property for a

private purpose.  The district court's efforts to avoid those clear Takings Clause violations failed at every turn.  This Court should reverse.[5]

## II.  Amendment 104 Violates Equal Protection By Subjecting CNB To Special, Disfavored Treatment Because Of Animus And Economic Protectionism.

Amendment 104's sins were not limited to taking CNB's property without compensation.  The amendment also specifically targeted CNB for disfavored treatment by eliminating its casino license, and *only* its casino license.  Ark. Const. amend. 104 §2.  No other holder of a casino license in Arkansas had its rights affected by the amendment, even though Amendment 100 authorized operations at four casinos, creating ready comparators that could equally bear the burden of any recalibration of the state's regulation of gaming.  By targeting a single license holder

---

[5] Below, Arkansas argued that CNB could not sue it under the Takings Clause because no cause of action existed to bring a suit for damages against state officials on that basis, and that sovereign immunity would bar any such suit in all events. R.Doc.128 at 6-11.  CNB will respond to those arguments in full if and when the state reprises them, but it is worth pointing out how little Arkansas' arguments would achieve anyway—at least for Arkansas.  Congress has supplied a cause of action to seek injunctive relief against state officers, *see* 42 U.S.C. §1983, and plaintiffs do not even need a statutory cause of action to seek injunctive relief in federal court in the first place, *see Ex parte Young*, 209 U.S. 123, 150-51 (1908).  Arkansas' argument that CNB lacks a cause of action to obtain just compensation from the state thus does not affect CNB's claims for injunctive relief.  Nor does Arkansas' sovereign-immunity argument, since the Eleventh Amendment does not bar suits for "prospective injunctive relief."  *Edelman v. Jordan*, 415 U.S. 651, 677 (1974). Arkansas' arguments thus serve only to make CNB's claim for injunctive relief *stronger*.  After all, if the courthouse doors are closed to CNB when it seeks just compensation, then it is all the clearer that CNB lacks an adequate remedy at law, and is therefore entitled to injunctive relief to vindicate its constitutional rights.

(at the instigation of an out-of-state entity uniquely threatened by that one license), Arkansas violated the Constitution.

When Amendment 104 revoked CNB's casino license while leaving all other casino licenses intact, it committed a paradigmatic Equal Protection Clause violation. The state looked at a class of similarly situated entities—Arkansas casino license holders—and decided that CNB, and only CNB, would suffer revocation of its license. That decision, which treated CNB as a distinct class of one, and subjected it to worse treatment than its peers, was impermissible. It was not in pursuit of any legitimate governmental objective and, even if it were, the state's means of attaining that objective were wholly detached from the ends it sought to achieve.

The Fourteenth Amendment guarantees to every person "the equal protection of the laws." U.S. Const. amend. XIV, §1. This guarantee "requires that all persons subjected to … legislation … be treated alike." *Hayes v. Missouri*, 120 U.S. 68, 71-72 (1887). Thus, "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008). Accordingly, when the government singles out individuals or businesses as a distinct "class of one" for disfavored treatment, it runs afoul of the Equal Protection Clause, unless it can provide a coherent and rational explanation for the singling out. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

CNB was similarly situated to its peer Arkansas casino license holders. Each of the four license holders was planning to operate gaming facilities in the state. Each had sought and obtained a casino gaming license through the state-established processes relevant to them. And each was in the process of spooling up its operations at the time Amendment 104 went into effect. On the state's purported theory of Amendment 104—to promote local control, *see* Ark. Const. amend. 104, Popular Title ("An amendment requiring local voter approval … for any new casino licenses …")—there was no meaningful difference between the licensees. The citizens of Arkansas' Pope County were no more or less entitled to have control over casino construction than were the citizens of Arkansas' Crittenden, Garland, and Jefferson Counties.

To be sure, there were minor variations in factual circumstances among the license holders. For example, two of the license holders were automatically granted their licenses without application based on their ownership of racetracks in the state, Ark. Const. amend. 100, §4(j), whereas the Pope County license (like the Jefferson County license) was assigned pursuant to a competitive application process, *id.* §4(n). But those variations in how they obtained their licenses do not defeat similarity. *Dalton v. Reynolds*, 2 F.4th 1300, 1310 (10th Cir. 2021) ("[S]imilarly situated does not mean identical."). Indeed, if anything the fact that CNB ran through various hoops to obtain its license—including (ironically now)

41

demonstrating local support—should have entitled its license to greater respect than those simply handed a casino license because they operated a racetrack. Regardless, a plaintiff need only be similar to the non-disfavored parties in "the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *accord Lynch v. ITT Educ. Servs., Inc.*, 571 F.App'x 440, 444 (6th Cir. 2014) (requiring only that parties be "similar (though not identical) in all relevant respects"); *Dalton*, 2 F.4th at 1310 (class of similarly situated individuals needs only have "at least one common distinguishing characteristic[,] … the one that defines who is part of the sub-class"). It would be hard to find more ready comparators than four entities all licensed pursuant to the same amendment to the state constitution.

The district court nonetheless invoked such trivial variations to claim that CNB was not similarly situated to other casino license holders. It noted that the Crittenden and Garland County facilities were not subject to an application process, and were assigned licenses directly by Amendment 100. J.App.1151-52, R.Doc.139 at 18-19. And Jefferson County had only one applicant for its license, whereas Pope County had multiple. J.App.1152, R.Doc.139 at 19. But none of those distinctions has any relevance to the state's decision to revoke CNB's casino license alone, rather than revoke all four or subject all four to uniform regulation to reflect whatever newfound concerns about gaming regulation could motivate legitimate state action.

To be clear, even if the state's true concern were promotion of local control over gaming or reduction in casino gaming, that concern draws no distinction on the lines the district court identified. Quite the opposite. If one wishes to promote local control, the licenses to revoke would have been the Crittenden and Garland County licenses, as those licenses were assigned to businesses by operation of law and without any opportunity for local participation in the application process. *See* Ark. Const. amend. 100, §4(j). By contrast, CNB not only had to apply for its license (twice), it had to demonstrate support from the local community to prove itself as the most attractive applicant for that license. *Id.* §4(n). That process gave CNB far more local support and involvement than the other licensees, *including* the Jefferson County licensee. And, of course, the supposed interest in local control rings hollow when Pope County voters themselves *rejected* eliminating the Pope County casino license, but the state did so anyway. J.App.783, R.Doc.135 at 366:15-17.

Perhaps the closest thing the district court identified to a salient difference between the licensees was that "Crittenden, Garland, and Jefferson Counties all had up-and-running casinos by early 2024, before [the] proposed Amendment 104 went to the voters." J.App.1152, R.Doc.139 at 19. But that cannot serve to distinguish CNB, which still had a license. Moreover, the delay the district court seized upon was the state's own fault—it delivered CNB a faulty license due to internal "administrative error[s]," and then proceeded to vacate the license entirely and force

CNB to reapply when those errors became known. J.App.443-44, R.Doc.134 at 26:19-27:5. Any delay in building the casino was thus entirely attributable to the state—had CNB been permitted to build when it first obtained the license, it would have had an operational casino three years sooner, on nearly the same timetable as the other competitive-application-process licensee in Jefferson County. The state cannot, through its own actions, forcibly delay CNB's construction of its casino and then turn around and invoke that delay as grounds to discriminate against CNB later. *Cf. In re Estate of Drake*, 4 A.3d 450, 454 (D.C. 2010) (explaining basic contract-law principle that "if a promisor is himself the cause of the failure of performance, … he cannot take advantage of the failure"). Regardless, whatever difference in their stages of operation, each entity had a license to operate, and the state only obliterated one of those licenses. If the more advanced state of the other casinos made Arkansas aware of the need for new regulations to regulate casinos, it could have applied those regulations to all four. Simply depriving one of the four of its license was not an available option.

And when Arkansas singled out CNB for worse treatment than its similarly situated peer licensees, that decision was not rationally related to a legitimate governmental objective. Indeed, Arkansas did not pursue a legitimate objective at all. Amendment 104 was a naked effort, spearheaded by Choctaw Nation, to promote Choctaw Nation's own casino and to avoid competition from its business

rival.  *E.g.*, J.App.456, 555, 609, R.Doc.134 at 39:1-2, 138:16-18, 192:21-23; J.App.785, 852-53, 853, 855, R.Doc 135 at 368:17-23, 435:20-436:1, 436:9-17, 438:10-14.  In other words, it was a transparent act of favoritism toward Choctaw Nation and animus against CNB.  Those interests fail twice over.

States do not have a legitimate interest in simply protecting a favored industry participant.  "[P]rotecting a discrete interest group from economic competition is not a legitimate governmental purpose."  *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002); *accord, e.g.*, *St. Joseph Abbey v. Castille*, 712 F.3d 215, 222 (5th Cir. 2013) ("[N]either precedent nor broader principles suggest that mere economic protection of a particular industry is a legitimate governmental purpose[.]"); *Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008) ("[M]ere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review.").  That is all the more true when the state's protectionism is not even targeted at favoring its own citizens, for whom it at least has some sovereign interest in aiding.  Here, Arkansas enacted Amendment 104 to promote the economic interests of an out-of-state business entity. *See* pp.28-34, *supra*.  That interest fails to pass muster.  *Craigmiles*, 312 F.3d at 224.

And Arkansas fares still worse when its interest is viewed as animus toward CNB specifically.  When a government action is "inexplicable by anything but animus toward the class it affects[,] it lacks a rational relationship to legitimate state

45

interests." *Romer v. Evans*, 517 U.S. 620, 632 (1996). After all, "a bare … desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (emphasis added). And that was precisely what Arkansas sought to achieve here. It, acting at the behest of Choctaw Nation, sought to disadvantage CNB and prevent CNB from competing with its own business ventures. But that kind of animus is not a legitimate aim for the government. *Id.* at 534-35.

To be sure, Arkansas argued that Amendment 104 was not advancing an agenda of economic protectionism, but rather increasing local control over casino gaming in the state and limiting the growth of casino gaming. R.Doc.30 at 17-21; R.Doc.81-1 at 4. This, it claimed, was "unquestionably … a rational basis for the new Amendment." R.Doc.30 at 19. But, as explained, that was a pretext for the state's true motive of protecting the pocketbook of an out-of-state business rival. *See* pp.28-34, *supra*. And that is all the clearer in light of how poor a fit Amendment 104 is for any supposed goal of increasing local control or limiting the spread of casino gaming. *See* pp.47-48, *infra*.

Moreover, in class-of-one and animus cases, a court is not free to substitute a rational pretext for actual animus. *See, e.g.*, *Romer*, 517 U.S. at 635. In those cases, courts must carefully scrutinize the record to see whether the plaintiff's "plausible accusation of impermissible favoritism … has merit." *Kelo*, 545 U.S. at 491

(Kennedy, J., concurring). Indeed, what distinguishes a class-of-one case from mine-run equal protection claims is the very fact of singling out one entity to shoulder burdens that should rationally be spread among the similarly situated parties, which raises a strong inference of animus. That cannot be dispelled after the fact by some judicially invented alternative explanation that has no grounding in the record.

Even so, if the Court accepted the state's alleged interest in "local control," it is difficult to see how Amendment 104 was rationally related to that end. That interest may justify Amendment 104's introduction of a special-election requirement for future casino licenses, Ark. Const. amend. 100, §3, but it cannot justify the revocation of an already-issued license. *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (requiring that "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985). If anything, Amendment 104 *undermines* the interests it purports to promote. The revocation was made on the basis of a statewide vote, without regard for the views of the citizens of Pope County, who actually *opposed* revoking CNB's casino license. J.App.783, R.Doc.135 at 366:15-17. And at the same time, it kept intact the licenses in Crittenden and Garland Counties, in which the local

communities had no voice and thus no "local control." There is no sense in which that combination of choices furthers an interest in local control.

Of course, Amendment 104 did not need to *perfectly* advance the cause of local control. *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 321 (1993); *Dandridge v. Williams*, 397 U.S. 471, 485 (1970). But enacting a policy that directly undermines its own stated ends goes beyond mere imperfect fit, and means that the amendment was not rationally related to its stated aims in the first place. *Romer*, 517 U.S. at 632 ("[A] law will be sustained if it can be said to *advance* a legitimate government interest." (emphasis added)).

## CONCLUSION

For the reasons set forth above, this Court should reverse.

Respectfully submitted,

s/Paul D. Clement

| | |
|---|---|
| BART W. CALHOUN | PAUL D. CLEMENT |
| SCOTT P. RICHARDSON | MATTHEW D. ROWEN |
| LAUREN MCCAULEY | JAMES Y. XI |
| BRITTANY DAWN WEBB | NICCOLO A. BELTRAMO |
| MCDANIEL & WOLFF | CLEMENT & MURPHY, PLLC |
| 1307 W. Fourth Street | 706 Duke Street |
| Little Rock, AR 72201 | Alexandria, VA 22314 |
| (501) 954-8000 | (202) 742-8900 |
| | paul.clement@clementmurphy.com |

*Counsel for Appellants*

January 20, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 11,389 words as determined by the word counting feature of Microsoft Word 2016.

Pursuant to Circuit Rule 28A(h), I also hereby certify that electronic files of this Brief and accompanying Addendum have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free.

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement